Calloway v. Cossart.

## CALLOWAY v. COSSART.

1. DEEDS: *Recitals in, as evidence.*
   Recitals in a grantor's deed, that he had paid for the land and received a patent certificate from the government, are not evidence against strangers to the deed.

2. SAME: *Lost, parol evidence of.*
   Parol evidence, that the deed had been executed but was not recorded and had been lost and could not be found, is sufficient to admit secondary proof by parol of its existence and effect.

3. JUDICIAL NOTICE: *Connection of the State with the Real Estate Bank.*
   The connection of the State with the organization of the old Real Estate Bank is a matter of history, and its affairs have been so often regulated by public Statutes, that in all general aspects they have become matters of judicial cognizance.

4. STATUTE OF LIMITATIONS: *As against the State.*
   The attitude of the State as to the assets or property of the Real Estate Bank, or her rights of indemnity in it, was just such as might have been assumed by any individual or corporation lending its credit to the bank; and when a State descends into the arena of common business in concert or competition with her citizens, she goes divested of her soverignty and the maxim, *"nullum tempus occurrit regi,"* does not apply.

5——45

| 45 | 81 |
| 56 | 491 |
| 45 | 81 |
| 57 | 480 |

| 45 | 81 |
| 74 | 307 |
| 74 | 308 |
| 75 | 197 |
| f76 | 165 |

| 45 | 81 |
| 81 | 301 |

5. SAME: *Paying taxes, etc. Adverse possession.*
  Neither conveyances, nor color of title, nor payment of taxes, nor all combined, can give title to land under the Statute of Limitations. There must be proof of adverse possession for the requisite time.

APPEAL from *Clark* Circuit Court in Chancery.
Hon. H. B. STEWART, Circuit Judge.

*J. H. Crawford* for appellant.

Admitting, for argument, that no deed was made to Thornton, the execution sale was public, and at the end of seven years, the title under the sale would be good by limitation. *Gantt's Dig., 4113; 38 Ark., 181.* Possession once established will be presumed to continue. *34 Id., 598.*

The deed to Thornton having been lost, parol evidence was admissible to prove the sale to him. The loss or destruction of an unrecorded instrument does not destroy or revest the title, or affect the title passed by it. *2 Mill., 445; 5 Conn., 262; 21 Ark., 80; 33 Id., 64.*

Taking possession of land *without title or claim or color of title,* does not constitute *adverse* holding, but such occupancy will be held to be subservient to the legal title. *2 Wall, (U. S.) 328.* The law presumes the legal seizin to be in him who has the title. *6 Pet., (U. S.) 743; 23 Ark., 735; Angell on Lim., Sec. 384.*

Title draws to it possession, and formal occupancy is unnecessary in case land remains unoccupied. *Cent. L. J., Vol. 4, p. 165.* The trustees and subsequently the receiver, for the benefit of the State, had all the possession possible under the circumstances. The State cannot take manual possession, and is not bound by the laches of its officers or by limitation unless specially named in the statute. *6 Peters, (U. S.) 666; 13 Wall., (U. S.) 92; 21 Mich., 24; 10 S. & R., 334; Cent. L. J.,*

*Vol. 11, p. 241; Angell on Lim., Sec. 34.* The rule will apply to property in the hands of a receiver for the benefit of the State. The statute will run in favor of the State. *Gantt's Dig., 5677; 39 Ark., 269.* In 1862 the State's equitable title, coupled with fourteen years possession, amounted to an investiture of title, and no attempted adverse holding afterwards could affect it. *34 Ark., 534.* Paying taxes gives no lien, nor confers any title. *17 Wall., (U. S.) 153.* These lands were not taxable until after the receiver's sale. *Gantt's Dig., Secs. 3962–4, 3984; 39 Ark., 320.*

The Appellee *pro se.*

Appellee's adverse possession under color of title for more than the period of limitation, vested the title in her absolutely. *18 Am. Rep., N. S., 209; 19 Id., 286; 34 Am. Rep., 534;* Neither Appellant, nor Thornton nor the Real Estate Bank ever had possession of these lands, and *38 Ark., 181* does not apply. But if they had, having permitted adverse possession, and taxes paid since 1862, their claim is *stale. 33 Ark., 762; 2 Bouvier L. Dic. (14 Ed.) 541.*

The Chancellor having found, *as a fact,* that Thornton never had a deed nor Appellant possession, this court will not reverse, unless the finding be wholly unsupported by evidence. *2 Ark., 360; 5 Id., 407; 6 Id., 86, 428; 10 Id., 138, 491, 638; &c., Nolen v. Harden. M. S.* If Thornton had no title, nothing passed by the execution sale to the bank nor to Appellant. But if he had any, Appellant was an innocent purchaser without actual or constructive notice, and Appellee purchased subject to her rights. *11 Wend, 81; 9 Ark., 365; 15 Id., 73; 16 Id., 543; 30 Id., 249; 1 Pars. Cont., 520; 5 Rep., 543; 8 Id., 177.* The doctrine of *caveat emptor* applies to execution sales. *10 Ark., 212; 38 Id., 351.*

Appellee was an innocent purchaser. Appellant fails to show that Thornton ever had recorded title, or that she had actual or

constructive notice.  *Gantt's Dig., Sec. 860; 38 Ark., 190.*
Appellee paid *full price* in good faith, appellant as a specula-
tor bought for an *inadequate price.*

EAKIN, J.   This is a case in equity, involving title to a tract
of land decsribed as the west half of the S. W. 1-4 and the S.
E. 1-4 of the S. W. 1-4 of Sec. 33 in T. 8, S. of R. 22 west.
The pleadings are somewhat confused by a cross complaint,
and by answers and demurrers on both sides ; but the matter
seems to have got pretty fairly, at last, before the Chancellor,
on the merits, each party seeking to quiet his or her title
against the other.   The Chancellor granted this relief to Mrs.
Cossart, who was the original complainant, and Calloway
appealed.

Calloway claims through a Sheriff's deed, made upon a sale
of the lands under a *fieri facias* issued in favor of the
trustees of the Real Estate Bank against Thornton and
Bozeman, on the 3d of November, 1847.   The land was pur-
chased by the trustees and the deed was executed to them on
the 15th of March, 1848.   Afterwards all the bank assets, in
the hands of the trustees were transfered to a Receiver in the
Pulaski Chancery Court, who, by order of the court, sold and
conveyed these lands to Calloway on the 19th of January,
1881.   The lands had been levied upon as the property of
Thornton, and it was necessary for Calloway to show title in
him.

1. EVIDENCE:
Recitals in
deeds.
This he endeavors to do by showing a deed for this land
from Joseph Delany and wife to Walter C. and Wm. F. Mc-
Laughlin on the 28th of October, 1837.   This deed recites that
full payment had been made for the land to the Government,
and that a patent certificate had been issued to the grantor,
Delaney.   Next, a deed from Wm. F., of his interest, to Walter
C. McLaughlin, on the 13th of December. 1839.   Next, a deed
from Walter C. McLaughlin to Samuel Gibbins in September,

1840. An abstract from the books of the State Auditor shows in the column of original owners of the land, sometimes Joseph Delany alone, and sometimes Joseph Delany and A. B. Caruthers. It was assessed in 1839 in the name of W. C. & W. F. McLaughlin, in 1840 to W. C. McLaughlin and in 1841, 1842 and 1843 to Samuel Gibbins.

This is all his documentary evidence, which it will be seen does not connect at either end of the line, between the Government and Thornton. The recital in Delany's deed that he had paid for the land and received the patent certificate cannot be used against strangers to the deed. At the other end, the connection fails to reach Thornton, the defendant, in the *fieri facias*. This hiatus it is attempted to supply by oral evidence. Mrs. Nancy E. McLaughiin, a daughter of Gibbins, testifies that she knows the place, and lived on it with her father, who occupied it about five years. The widow of A. B. Caruthers was living on it when she testified. When, exactly, that was, is not shown, although the deposition appears to have been opened, filed and published in July, 1883. She was 58 when she testified, and was about 15 when her father moved on the place, which would extend his occupation of it from about 1840 to 1845, about two years before the levy of the *fieri facias*. She says that her father sold the place to Thornton and moved elsewhere. He made a deed to Thornton, but her mother did not sign it. She says that after her father sold to Thornton, she knows of four different families living on the land in different years. Her testimony is corroborated in all points by that of Wm. Crow, a witness, 61 years of age, well acquainted with the land. He says he knows all the facts set forth in her deposition and adopts her statements, although he does not specially mention the deed to Thornton, nor give any independent testimony.

Wm. H. Weir, a resident of the county and well acquainted with the place, says that A. B. Caruthers fenced up a portion of

the Gibbins' field just before the war, but had not lived on or cultivated any portion of it before that time.

2. LOST
DEEDS: Parol
evidence of.

Calloway, defendant to the original bill, says that he has made diligent search for the deed from Gibbins to Thornton, referred to by Mrs. McLaughlin, but without success. Thornton went to Mexico before 1848, and has never returned. About the period referred to very few persons were in the habit of having their deeds recorded. Real property was sold and possession transferred, he says, pretty much as personal property was. He has no personal knowledge that Thornton ever had a deed or had possession, or paid any taxes. Since his own purchase in 1881, he has never himself had possession nor paid any taxes. He bought it at the Receiver's sale at public auction for $20. It is worth about $500. When he bought, he had heard and knew that Mrs. Cossart claimed the land.

The effect of this oral evidence seems to be that the loss of the Thornton deed and the impossibility of getting possession of it as an instrument of evidence, if it ever existed, was sufficiently established to admit secondary proof by parol, of its existence and effect, and that it was sufficiently proved to make, *prima facie*, a chain by which title was dereigned from Delany to Calloway, although it still fails to reach back to the Government for want of proof that Delany was the pantentee or had the patent certificate. It seems to make also a *prima facie* case of adverse possession in Gibbins presumed to continue in Thornton up to a period shortly before the war, when a part of the land was occupied and fenced by Caruthers. Not a very strong case, but sufficient to prevail as a *prima facie one* against any claimant not able to show a better title. This would be an adverse possession long enough to ripen into a positive title under the Statute of Limitations, unless rebutted, or in some way neutralized. *Walker v. Towns, 23 Ark., 147*, presents a similar case. And this title would pass to the trustees, and

through the Receiver to Calloway, regardless of the value of the land, or the price he paid for it, or the mere knowledge of an adverse claim, provided that claim had no just foundation. We turn now to the case made by Mrs. Cossart.

She does not attempt to trace title by any writing from the original, nor any common source, but rather to establish it by adverse possession after its occupation by Gibbins and sale to Thornton. She is challenged *in limine* with the assertion that she may not do that; inasmuch as the purchase by the Real Estate Bank trustees carried the equitable title to the State, and no laches may be attributed to sovereignty.

The connection of the State with the organization of the old Real Estate Bank is matter of history, and its affairs have been so often regulated by public Statutes, that in all general aspects, they have become matters of judicial cognizance. The State did not own the bank nor its assets. It aided the bank with its bonds and looked to its assets for security or indemnity. The stock was subscribed by individuals and the payment secured by land mortgages, which, with all other assets, constituted its capital and made its basis of credit. To this alone the State looked in common with other creditors.

3. JUDICIAL NOTICE: Connection of State with Real Estate Bank.

The assignment made by the bank to trustees on the 2d day of April, 1842, was not specially for the use of the State. It was in trust to pay; 1st, balances due for services and salaries; 2d, sums due depositors, and balances due individuals and other banks; 3d, to call in and pay outstanding circulation; 4th, to pay interest on certain State bonds issued to the bank; 5th, to pay bonuses falling due to the State according to the terms of the charter; 6th, to pay the principal of the State bonds aforesaid, and 7th, to repay what was actually received on another lot of bonds which had been hypothecated and passed into the hands of the Holfords. Under this assignment the trustees were acting, who bought in the lands levied upon as the property of Thornton. Such property as they acquired

passed under the trust and became mingled with the general assets.

Afterwards upon suit by the State against the residuary trustees, a decree was rendered in the Pulaski Chancery Court, by which the trustees were relieved of further duties, and all the property and effects placed in the hands of a receiver, to be managed and administered under the control of the court. This decree was entered on the 20th of April, 1855. No useless delay was contemplated in the preservation of the assets, or in realizing the proceeds. It was expressly made the duty of the receiver to sue for and recover all property, real and personal belonging to the bank, or said trustees, which might be held adversely by any one.

4. STATUTE OF LIMITATIONS as against the State.

It is obvious that all these were plain business transactions after the grant of the original franchises. The attitude of the State with regard to this property, or her rights of indemnity in it, was just such as might have been assumed by any individual or private corporation, which might have chosen to lend its credit to the bank. When a State steps down into the arena of common business in concert, or in competition with her citizens, she goes divested of her sovereignty. The reason of the maxim, " *Nullum tempus occurrit regi*," no longer applies. U. S. Bank v. McKenzie, *2 Brock (C. J. Marshall's Dec.), 393; U. S. v. White, 2 Hill, N. Y., 59; Fields v. Wheatly, 1 Sneed, 351; Bank of Tenn., v. Dibrell, 3 Sneed, 379; Bank of U. S. v. Planters' Bank of Ga., 9 Wheaton, 904; Angell on Lim. 6 Ed. Sec. 41.*

There was nothing to prevent the trustees at any time, nor the receiver after them, from suing at once for these lands, and the title which had ripened in them by adverse possession, might be transferred again in the same manner. Mrs. Cossart might show that by a subsequent adverse possession for a sufficient time, on the part of herself or those under whom she claimed she had acquired a better right.

It seems to be conceded that at a very early date A. B. Caruthers was the owner by original entry, and this is shown by oral proof; but the same evidence goes further to show that he had sold and conveyed it to Joseph Delany, before the beginning of the chain of conveyances upon which the defendant Calloway relies. There is nothing to show color of title in Caruthers by patent, or any subsequent conveyance to him from any quarter. It is shown that many years afterwards, and after the title by limitation under Delany's claim of conveyances had ripened into an investiture in favor of those claiming under him, he did claim that he could still hold the land, because his deed to Delany had never been recorded. In this he was, of course, mistaken. A short time before the war, he entered upon the land, and enclosed a part, but as the beginning of a new title, this proof can amount to nothing, as he had no color to define boundaries, and the extent of his possession is not given. He cannot occupy a better position, by this, than that of a mere trespasser. How long the possession continued is not shown.

On the 8th of August, 1866, he executed to Brown a deed of trust to secure certain debts. Brown sold under the deed and conveyed to McMillan in Feb., 1871, and McMillan to Joseph Cossart in August following. Cossart was a party to a suit in the United States Circuit Court for the district in 1879, in which suit Kramer had been appointed a receiver, and by order of the court, made in December of that year, Kramer sold and conveyed to Mrs. Nancy Cossart, the complainant below.

An abstract from the tax books of Clark County shows that for the years 1868, 69, 72 and 73, the lands were noted as Bank lands, but were, in 1871, marked to A. B. Caruthers.

Neither conveyances, nor color of title, nor payment of taxes, nor all combined can give title to land under the Statute of Limitation. There must be proof of adverse possession for the requisite time. Valid conveyances from those having title,

5. SAME: Adverse possession.

require no statute to support them.  We fail to find any evidence of such possession on the part of Mrs. Cossart, or those under whom she claims.

5. SAME: Adverse possession.

The Chancellor based his decree upon the ground that no title was shown in Thornton.   If this were true it might have been sufficient to warrant the dismissal of Calloway's cross complaint, but we think the Honorable Chancellor erred in his conclusion.   The evidence preponderates largely to show that from the time of Delany's deed to the McLaughlins, to the time of Gibbon's sale to Thornton, and down to very nearly the beginning of the war, the claim and possession of those under whom the Bank held was adverse and uninterrupted.

Disputed titles, depending upon oral testimony, where deeds have been lost, or conveyances neglected, should be early quieted by aid of the best lights which the court may obtain, when it appears hopeless that better may be had.

Reverse the decree, and let a decree be entered here, quieting the title of Appellant Calloway against all claims of the appellee.